Good morning. May it please the Court, my name is Eric Rossman. I represent the appellant in this case, Boise Tower Associates, LLC. This case is on appeal following a summary judgment decision by the lower court entered on April 2, 2007, dismissing the plaintiff's case in its entirety. The relevant facts for this appeal are basically that Boise Tower is the owner of a certain real property in Boise, Idaho, was constructing a 26-story condominium project in Boise, Idaho. Rick Peterson is the managing member of the LLC. And in 2001, they had worked with a company called Washington Capital Management to borrow money to construct the project. Washington Capital Management was a management company for a Washington Capital Management joint master trust, which is a trust fund that invests union pension funds in certain projects. A letter of commitment was issued by Washington Capital Management for the project to loan $29 million for its construction on October 10, 2001. Two days later, Boise Tower accepted a letter of commitment, signed the letter of commitment, sent it back with a check. The expiration date under the original letter of commitment was December 1, 2001, and the letter of commitment included some closing requirements, some conditions that needed to be satisfied. The ones at issue on appeal are a pre-sale requirement, an equity requirement, and a union participation requirement. Subsequent to the acceptance of the letter of commitment, a dispute arose as to Boise Tower's general contractor, who was Mortenson Construction, Inc. Mortenson Construction is an international contractor of major projects. In late November 2001, communication was made to Boise Tower that Mortenson Construction was required, as a condition of receiving these loan funds, to sign a labor agreement with all the major unions. A response was made to Washington Capital Management that because Mortenson Construction, as it had been saying all along, was not going to directly perform any labor on this project, was going to subcontract it out, that they were not required under the letter of commitment, the language of the letter of commitment, to sign labor agreements with the relevant unions. Boise Tower received a response back, and Mortenson received a response back in late November 2001 from Washington Capital, from both Al Janke, who was representative of Washington Capital, and Rich Hardin, who was a representative of Washington Capital. They received multiple communications back that basically stated, we don't care whether Mortenson is going to self-perform this contract. We don't care what the letter of commitment says. You are not getting any money unless Mortenson signs a labor agreement. At that point in time, we submit to the court that that was a repudiation of the contract. They attempted to add an additional term that was not contained within the letter of commitment, and at that point, Boise Tower's continued performance was excused. On appeal, I would submit to this court that the lower court's decision and the respondent's position on appeal should fall with Federal Rule of Civil Procedure 56. Under that rule, if there is any genuine issue of material fact upon which relief can be granted, summary judgment must be denied. All material facts must be liberally construed in favor of the non-moving party, and on appeal, this court will review that decision or should review that decision. Counsel, the problem I have with your position is that the parties continue to, both parties continue to seek to fulfill the loan requirements, and so what does that do to your repudiation theory? Well, I think if you look at the United Bank of California v. Prudential case, it's an interesting case. It's a case that I think is almost squarely on point with what we've had in this case. Arizona? Yes. But if you look at that case, it cited not just its own authority in the State of Arizona. It also did a survey of the authority around the country and indicated that a majority of jurisdictions, including or in addition to the restatement of contracts, Williston on contracts and Corbin on contracts, indicate that continued performance under a contract following a repudiation does not constitute a waiver of the party's ability to sue on a repudiation. And it makes sense. That's good business practice, because otherwise a developer would be in a situation where instead of trying to mitigate damages, work with the lender, try to find a way to get through it and get the project built, according to the respondents, according to the lower court, what the developer has to do in order to preserve his claim relating to the breach is run to the courthouse and file suit. I think that puts a developer in a very difficult predicament. And that's why the United Bank of California case stated and cited multiple areas of authority to support that in not just that jurisdiction. But if you continue to try to mitigate your damages, you continue to try to work with the lender to close the loan, you are not compromising your ability to sue if you're unsuccessful as it relates to the original repudiation of the contract. What about the extensions and the, you know, the change, the acceptance of the condition with the second extension? Well, I would submit to the court that the lower court – first of all, I would say there was clearly a genuine issue of material fact in that. What the court said was – But the genuine – What the lower court said was that there was an individual named Russ Cree that the court believed as a matter of law was my client's agent and negotiated a second extension to this contract into January of 2002 in order to close the loan and somehow negotiated this additional term in addition to the extension of the contract, that being that Mortensen will sign a labor agreement. Well, first of all, there's no evidence in the record that Russ Cree, even if he was my client's agent, there's no evidence in the record that Russ Cree accepted or agreed to the additional condition, that he even knew about the additional condition. There's no evidence in the record that he ever saw the January 2nd letter from the lender identifying the additional condition. Well, how do you explain that your client represented to the development corporation that the loan commitment had been extended? And if that was not accepted, why would that representation be made? And I would submit to the court, just as in the United Bank case, he was trying to mitigate his damages. He was trying to save his project. Filing a complaint in court is going to take time and he's going to lose the project. His option is, well, let's see if we can continue to work with him and try to get this loan closed to save the project, but we're in no way admitting or confessing or agreeing that Mortensen is required to sign a labor agreement under the original letter of commitment. We're not waiving that. But at least in January, it was pretty clear that that was in writing and that your client was still acting now as if it accepted that term. What my client did is my client represented to CCDC and his affidavit testimony establishes that as well as his deposition testimony, that what he communicated to CCDC was Washington Capital has extended the loan date, has extended it to the end of January, but we still believe and we still hold the position that Mortensen is not required to sign a labor agreement where we're... Well, it said in the record that that acceptance was conditioned, that the representation was made by your client to CCDC that the acceptance was conditional. Where is that in the record? My client represented in his affidavit testimony below as well as his deposition testimony that what he said to CCDC was the lender extended the deadline to get this closed. They tried to infuse a new term. We still believe Mortensen is not obligated to sign that, but Mortensen is trying to come to an agreement with the union so I can save my project. That is not a waiver. That is not a release of claims. That is not any... That is a reasonable developer trying to save a project before going to the court system. And there's nothing in the record that would demonstrate that Rick Peterson at any time intended to waive or release any claims against the lender for repudiating and breaching that contract. And that's the main point. Secondly, the court based its decision that in large part that the contract was modified by the January extension on the fact that Russ Cree was my client's agent. Was that part of the affidavit? I know it's kind of nebulous which parts of the affidavit were stricken, but isn't that part of the affidavit that was objected to and sort of called into question by the court because it was inconsistent? That is extremely confusing, Judge Rowanson. What happened below is opposing counsel filed a exhaustive motion to strike the affidavit of my client. Exhaustive. Identified sentences that they believed should be stricken. Identified reasons as to why they should be stricken. Not just because they believed arguably the affidavit testimony was inconsistent with some of his deposition testimony taken over three days. Wasn't this one of the points though? In the deposition testimony he said that it was clear in the second extension that if Mortenson chose not to hire direct labor, it now was mandatory that they become signatory to these labor agreements, and that is the difference. So it was a modification of the original loan commitment. That's what he said in his deposition. So his affidavit can't come back later and say, no, I objected to that. I think what the distinction is, a modification requires consent by both parties, an agreement to not just modify as of January 2nd forward, but to modify the contract back to its date of inception prior to the repudiation, that we're going to infuse this new term because the lender is force-feeding it to us. Well, he said it. And I'm trying to save my project. He said it in the deposition. It was a modification. He didn't condition it. He didn't say I didn't agree to it. He forced it on me. If I'd had my way, I would have stuck to my guns, but I was, you know, I had to satisfy the development corporation. He didn't say that in his deposition. I think a fair reading of his deposition testimony, and if you look at it as a whole, I mean, it's three days long, and that issue was addressed on numerous occasions. If you look at his deposition testimony, what he's saying is, a fair reading of that deposition testimony is that there was a new deal, and what the new deal was, the lender was forcing us to do this. He never once in that deposition testimony said, I agreed with it or accepted it. He just said, that is the card that we've been dealt. That is the hand that we've been dealt. Now, in order to save my project, rather than running out to court immediately in order to try to save my project, I'm going to see if Mortenson can try to reach an agreement with the union. Well, continue to negotiate with a different lender. But I don't think that's a retroactive modification of a contract. If anything, it's a unilateral modification by the lender that from January 2nd forward, the only way this loan is going to close is with this additional term. There's no discussion about that applying retroactively to the date of the letter of commitment. There's no discussion about Boise Tower agreeing that it would waive any claims that it had. Well, that was not a new term. From the beginning, that was on the table in terms of that was what the lender said from the beginning. And the question was whether or not it had been made clear or not. Well, the lender said from the beginning, the letter of commitment said from the beginning, if the contractor, the general contractor, is going to utilize a directly hired workforce, if it's going to self-perform this contract, it's got to have labor agreements. Mortenson said from day one that it was not going to self-perform this contract. It was going to subcontract this project. Therefore, it was not responsible for signing labor agreements. But the subcontractor didn't have union agreements. The subcontractor did have an agreement with the unions. It was not signed as of the date of repudiation, which was before the deadline to close this loan. How can you have an agreement that's not signed? Because the way that happened, Your Honor, is construction was continuing at the time the letter of commitment came out. So what John Novoi on behalf of Mortenson did is he went to each of the unions and he said, look, I've got New Way Construction. They're performing work on this project. Negotiate with them, please. And let me know if you reach an agreement. Contacts him again. All of the unions represented to Mr. Novoi that they had an agreement with New Way and New Way was immediately paying union benefits prior to the closing of the transaction, was immediately paying union benefits. He communicated with Washington Capital as required in the letter of commitment and said, New Way's performing construction. They have an agreement in concept with the unions and it will be signed once a closing date is scheduled. There's some information in the record that indicates that your client was telling his people not to sign these agreements, not to sign the union agreements. And that's a very important point, Your Honor. Yes, I would agree. Mr. Peterson was informing Mortenson and New Way not to sign the labor agreements, but he was not telling them not to negotiate an agreement. What he was saying is, wait until there's a closing date. Wait until we're sure that this company, that this lender is going to give us our money because we've got this dispute over Mortenson. Wait until we have a closing date to sign these labor agreements because otherwise you're going to be stuck to 9A, Section 9A collective bargaining agreements that don't terminate with the end of the contract, that are binding upon them and basically turn them into a union contractor in a community that is not a union community. Well, but there's also some indication that he was negotiating with another lender that was non-union, so he was trying to play both ends against the middle at that point. Well, that's a company called Opus, and if I've ever seen a red herring, that's a red herring. What happened is there's a letter of commitment issued by Washington Capital. Nothing in the letter of commitment says, developer, you can't continue discussing the Opus says that, and it wasn't until December 18th, after the repudiation of the contract, that Mr. Peterson signed a letter of intent with Opus. It was not, yes, he was talking to them before the repudiation, but that's what a responsible developer does on a project like this. It was not until after the repudiation, after Washington Capital said, we're not closing this loan unless Mortenson signs a labor agreement, that Rick Peterson went and signed a letter of intent with Opus, and that's what he's required to do. He's got to do that by law. I see I'm out of time. Thank you. Thank you, Your Honor. May I? Well, I'll let you have a minute for rebuttal. Go ahead. May it please the Court. My name is Jim Martin, counsel for the appellees. Opus was not a red herring. Opus explains a lot what was going on here, because the Opus deal didn't have a union provision, it didn't have a pre-sale provision, and it didn't have an equity provision. And those discussions began five days after they signed our loan commitment. Five days he was having discussions with Opus. On the modification argument, Your Honor, that you raised, Judge Rawlinson, we need to look at what the state of the record was at that time. Not only did you have them communicating with CCDC when they asked him directly, has your loan been extended? And Mr. Peterson said, I will fax you a copy of the loan extension. We also have Mortenson's own meeting minutes on January 9th after they met with Mortenson. Mortenson was threatening to walk off the job because financing wasn't in place. They wanted to know as well, what's the status of your financing? And in Boise Tower's own minutes on January 9th, it's reflected, loan date has been extended. Loan date has been extended. There was a modification. There was modification by ratification, and there was modification by the fact that this Mr. Peterson. Agency can be actual and apparent. The actual agency authority was granted by that brokerage and representation agreement that Rick Peterson signed. It's agency in fact, it's agency in contract. The apparent authority issue, when you look at that apparent authority issue, you have to look at it from what did Washington Capital know? Washington had negotiated the terms of the initial loan application, and all through this process he was working for Boise Tower. And what they have yet to address in this record is the fact that Cree had the authority to obtain and get the first extension. That's never been debated. So when did they withdraw the authority? There's nothing in the record to indicate that at any point they went back and said, time out Washington Capital, heads up. We just withdrew Russ Cree's authority. He no longer can represent our interests. He no longer can speak on our behalf. And that's when Washington Capital said, okay, we're moving forward with this. The union issue did come up. And when the issue came up, Washington Capital's position from day one was Mortensen needs to sign. In this record we have evidence that they've never done a deal where the general contractor didn't sign, and that was in Cree's testimony. So all along they were thinking, Mortensen's going to sign, Mortensen's going to sign. But until that point, they were looking at a bunch of different issues. And when they got to that point, and in time, where they started talking about the second extension, they said, we're going to remind you. They sent a letter on December 7th saying, this is our warning. If you ask for another extension, Mortensen's going to sign. We need to have them sign. And then they took that action, the ratification action that we looked at. If we look, I think if we go back, and that's modification, but I think the other thing that we have to deal with and have to look at is this question about did they have to continue to perform. No, they didn't have to continue to perform. But if once they started to perform, it's different than if it's a question of, okay, we were performing, but then we amended our contract. But more importantly, let's go back to when is the moment of repudiation? When did Washington Capital make it clear to them, Mortensen doesn't sign this union labor agreement. This loan will not close. The moment of repudiation is November 27th, 2001. This loan agreement was in place from October 10th to November 27th, 2001. Peterson's own affidavit, paragraph 38, says, everything was fine until then. That means they had four days to meet those major pre-closing requirements, four days to get everything in order. If they were close to getting that done, you think they would have come forward to this court and the lower court below and said, this is where we were with four days left to go on this loan commitment. Here's all of the reaffirmation agreements that we have so far. Here is our proposal on how we're going to close the $7.2 million equity gap. And here are the signed union and labor agreements that we have. They have four days to get that done. Even if you give them the benefit of the first extension, which their agent re-asked for, the state of the record remains the same. As of the end of December 31st, still not a single reaffirmation agreement, still not a signed union labor agreement. And in fact, the court is correct that when they started the directive for Mortensen not to sign and for Newey not to sign, it came before the loan commitment was signed and it came after the loan commitment was signed. And the record that we have is it wasn't until February 12th, 2002, when Peterson finally said, you guys can start negotiating with the unions so that you can get your union labor agreements in place. But counsel, didn't Washington Capitol accept the report from Boise Tower regarding the extent to which the reaffirmation or the extent to which the sales had been made and I'm sorry. Go ahead. Go ahead. Two different issues, Your Honor. Okay. One is the whole, the numbers. There's two, there's three different things to the pre-sales. One is you got to have these numbers. You got to have 60 condo sales. You got to have 94 parking stalls and you got to have an office space. Right. There was a debate, and I'll give you, there was a debate about whether or not they had the numbers. The record evidence is, is that when Washington Capitol did its inspection in mid-November, they found all kinds of problems with what they purported were 60 pre-sales. They went through it and they identified the issues. She put pink tags on them and said, these are the issues I have with these pre-sales. At what point was that? That was mid-November of 2001. And there's nothing And you were talking about the time, was that four days before the mall was supposed to close? No. The inspection of the pre-sale files, when the folks went down to Boise and looked at the files that they had, that was, I think it was November 10th, 2001. And they identified a number of issues that they had with those sales. But more importantly, I think, Your Honor, is the fact that the reason that these reaffirmations, they actually had to go out to each and every one of these buyers and get them to sign a new amendment to the purchase and sale agreement. They had to go out and go find all these buyers located all across the country and sign an agreement. And what we have in this record is that their attorney, Mark Rowley, did not even draft that form until November 14th. And then they had a mid-December Christmas party where they brought some of the borrowers that were local, buyers that were local, into that Christmas party and tried to have them sign it. They never submitted one of those reaffirmation agreements to Washington Capitol, not in November, not in December. And you have to keep in mind on those conditions preceding that the Washington Capitol remain, have the, two points on the conditions preceding. One is their strict compliance. You can't just say, I got close. You have to show that you got, you could get it done. But isn't there a material question of fact on that? If O. S. E. Tyler says because of the repudiation, they didn't get the reaffirmation agreement. And I think that's why you have to go back to what was the moment of repudiation. It didn't happen until November 27th, four days before the commitment period was going to expire. Their request for the first extension wasn't a result of our repudiation act. Their request for extension according to rest pre-zoned testimony was it was clear to us we weren't going to make the December 1st deadline. So that's why you have to look at it in this time frame. When did this act happen? And if you get down to just four days left, that's when the courts and that's when all the cases say is when you look to see if they could ready, willing and able to perform. So you say in four days it would have been impossible for them to get the reaffirmations that they needed? Absolutely. No reasonable juror would find that in four days they could go to zero to 155 pre-sale reaffirmation agreements. It's not possible. This is simply not possible. They knew from the get-go they were going to need those reaffirmation agreements, correct? They knew since June 2001 when they filled out the loan application that they needed those reaffirmation documents. And they knew, they even admitted in their testimony we wanted to do that ourselves. These sales were two to three years old. The project had already sold to them in 1997. Some of these sales were two to three years old. No one had any idea whether the buyers even wanted to do the deal steal. So that was why it was an express condition in this loan commitment. You get out there and make sure these deals are good. And they didn't even start that process until November 14th at the earliest when counsel prepared that letter, the amendment to the purchase and sale agreements. And on the 27th of November, they hadn't obtained a single reaffirmation. And by December 31st, there's nothing in this record to indicate that they got there. What we have in the record is that January 28th, like the court said, they continued to perform. And on January 28th, they submitted a report to us that showed they had obtained 37 of the 60 condo pre-sale reaffirmations and 47 of the 94 parking sale reaffirmations. It's not a reasonable juror couldn't find that that is the case, Your Honor. What about the labor agreement? Labor agreement is a very good issue. Because here we have, Your Honor, a loan commitment that expressly provides these subcontractors have to be under signed union labor agreements. The reason for that is this lender is loaning the money of pension fund, carpenters union, laborers union, and cement masons from all over the Northwest. When they gave them the work out of this as well, pretty simple process. The loan commitment, as Judge Williams found in his first opinion, required the subcontractors to be signatory before they commenced construction on this job. New Way started work on this job. It's undisputed without signing a union labor agreement. That's undisputed. And what they have and what Mr. Rossman says, well, they have this verbal agreement. The loan commitment didn't allow for a verbal agreement. And when you look at L. Janky's testimony, what he said was, I knew New Way was on the site, but I knew also that they had to sign before this loan would close. And that's what Judge Williams said this loan commitment provided, and that's what certainly Washington Capital took that position. You have to have that. They had an obligation and a duty to go out and make sure that when it got that close to those last four days, that they were in a position to have signed union labor agreements. If you look at SCR 147, it's the only thing we have in the record in terms of how long it might take to get those agreements in place. And Mortenson said, once we got released from our directive not to have anybody sign, it would take a minimum of three weeks to have these negotiations take place. Same on this, the equity issue. Just for just one second, I want to touch on that. Because I think you have to look back and say, okay, where was he at in terms of complying with this condition which showed he had a $7.2 million gap? $7.2 million gap. We know that on December 6th, the last thing he told Russ Cree and Washington Capital was, I'm not putting any more money into this project. You're going to have to figure out how to do this deal with what you already have. That's the last objective manifestation that Mr. Peterson gave to these folks. There's nothing in the record. And even when you look at his affidavit and his deposition testimony, he never recants that or he never says, oh, and then I submitted this proposal about how I was going to get that done. Well, isn't it a different issue as to whether he could fulfill the equity gap and whether he would? So what was the issue in this case? On the equity issue, Your Honor, it was the willingness. The last objective manifestation that we had in order for us to exercise our discretion as to whether or not he could comply with that condition. Could or would? Would. Would. We don't question for a minute that he has a $55 million net worth. He has all kinds of properties that he could go out and get and solve this gap. Our issue is with the last thing he told us is, I'm not going to. I'm not going to. And when we asked him, and even if you look at his affidavit in the specific paragraph where he tries to address this issue, he doesn't say, I told after that meeting in December, I went back with him with a written proposal or even an oral proposal and said, this is how I'm going to solve this issue. That never happened. There's no willingness to show. And if he doesn't have the willingness to show, he simply can't meet that obligation. I don't have anything further. Thank you, Your Honor. I have a minute for rebuttal. Okay. I'll do the best I can. I'll start with that equity. Well, opposing counsel's position on appeal is, despite the fact my client repudiated the loan, despite the fact Boise Tower is excused from performance, we don't have to, we can't get sued in this case because Boise Tower continued to try to save its project and because, oh, in hindsight, it couldn't or in this case wouldn't have satisfied its closing conditions. Well, with equity, first of all, there is no question whatsoever that Boise Tower could have closed this loan, even on December 1st, much less December 31st, the extended date. What about opposing counsel's observation that four days before the loan was supposed to close, the reaffirmation agreements were nonexistent? He uses the date of November 27th because it's convenient for him. Throughout the record, the communications are late November is when they finally said, we are not closing this loan. There is nothing in the record that says that Boise Tower could not obtain these reaffirmations in four days, much less a week to two weeks. In one day, they collected 37 of them. They weren't rushing out to get reaffirmations because Washington Capital told them the loan's not closing. Why would you go to a buyer who's signed a contract to buy a unit and say, sign this reaffirmation. It appears the project's going forward when we've already been told that it's not going forward. It would seem to me if you started in June and as far as you were aware, the loan was going to close in November, you wouldn't be at November, late November, with only a few reaffirmations in any event. Even before you knew the loan was not going to close, it would seem to me that a responsible developer would have those reaffirmation agreements because you didn't know that the loan was going to be repudiated. So why wouldn't you have those reaffirmation agreements anyway? Well, I think we have a responsible developer here. And what he didn't want to do was create false impression to his unit purchasers. The first time, he had binding contracts for 57 of 60 of these units. There are all of them. Some of them were all, they're still binding contracts. He's told on October 10th that he's got to get reaffirmations from them. Okay. But then this issue about union participation comes up and he says, I'm not going to my unit holders and having them sign reaffirmations  I can't do anything except say, I still intend to purchase this if the loan closes. That's all it does. But the question is whether there's a genuine issue of material fact as to whether he was willing and able to collect those reaffirmations by the closing date, had it been scheduled. Okay. Thank you. Thank you, Your Honor. Okay. Our next, the last case for argument this morning, California Insurance Company versus Simpson Lumber Company.
judges: Paez, Rawlinson, Collins